**William JONES, Jr.,
Employee-Appellant,**

v.

**CENTRAL MISSOURI PAVING COMPANY, Michigan Mutual Insurance,
Employer/Insurer-Respondent.**

**No. WD 37724.**

Missouri Court of Appeals,
Western District.

June 17, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 24, 1986.

Application to Transfer Denied
Sept. 16, 1986.

Wayne E. Schirmer, Moberly, for employee-appellant.

Anne W. Elsberryer, Hunter, Chamier, Lee, Elsberry & Brown, Moberly, for employer/insurer-respondent.

Before MANFORD, P.J., and PRITCHARD and TURNAGE, JJ.

TURNAGE, Judge.

William Jones, Jr., filed an application for benefits under the Workers' Compensation Law. The administrative law judge denied compensation and on appeal to the Labor and Industrial Relations Commission the denial was affirmed. On this appeal Jones contends the facts do not support the finding that his injury did not arise out of and in the course of his employment. Affirmed.

Jones was employed by Central Missouri Paving Company as the manager of its plant located south of Moberly. Central Missouri maintained a shop site north of Moberly where the company's office was located and where equipment was stored. The shop site was located on the same tract of land as the personal residence of Mr. and Mrs. Wencil Eads, the owners of Central Missouri. The shop site was served by a driveway which entered the tract through a brick arch fitted with iron gates. The shop itself was about 100–150 yards from the highway and the arch.

Jones performed practically all of his job duties at the plant, although on occasion he would work on road crews applying asphalt. On Friday, August 26, 1983, Jones arrived at the plant between 5:00 and 5:30 a.m. and continued working there until the plant shut down about 2:00 p.m. Jones remained at the plant after the shutdown in order to be there to direct the unloading of some material that was to arrive. Jones normally drove a company truck equipped with a welder but that morning another employee took the truck to the job site on Highway 36 because it also had a crane which was needed there. At about 6:00 to

6:30 p.m. Jones left the plant in the company of Gilbert Specht who worked at the plant under the supervision of Jones. Jones and Specht went to the shop site for the purpose of picking up some parts which they planned to use the following day to make some repairs at the plant. On the way to the shop site Jones stopped and picked up a six-pack of beer. After arriving at the shop site Jones and Specht spent about an hour looking for the parts they would need. Jones testified that he had previously sent word to the crew working on Highway 36 that he needed his regular truck returned to him on Friday night so that he could perform the repairs on Saturday at the plant.

There was evidence that normally the truck with the crane would be left at the job site on Highway 36. There was also evidence that Jones did not work on Saturday without the prior approval of Wencil Eads and Eads had not given approval for Jones to work on Saturday, August 27.

Jones and Specht located the parts they needed at the shop site by about 7:30 p.m. and Jones testified that he remained at the shop site to await the return of his regular truck. With Jones and Specht at the shop site were Julian Mollick, Danny Benn and Roy Houk, truck drivers for Central Missouri. Jones consumed one or two beers while looking for the parts. Specht had a three-wheel motorcycle in the back of his personally owned pickup truck. After the parts had been located Specht unloaded the cycle and several of those present took turns riding it up and down the driveway between the arch entrance and the shop. Jones rode the cycle without incident but on his second turn he ran into the iron gate at the entry arch. Jones suffered six fractures to his right leg below the knee which required by the time of the hearing three surgical procedures including bone grafts and the application of steel plate supports. Jones' medical bills totaled over $24,000.

Jones and other employees testified that at the plant site there were periods when employees had nothing to do but to wait for a truck to arrive before they could resume their work. Jones and other employees testified that during these times of waiting they had seen employees engage in target shooting, fishing, hunting, going to town for food, using a tread mill, and lifting weights. Mr. and Mrs. Eads testified that they did not condone or approve of activities other than work taking place during work hours and said there was always something employees could be doing. There was evidence that the three-wheel motorcycle had been ridden at the plant. Specht testified he had ridden his three-wheel cycle several times but there was no set amount of time. Mollick testified a three-wheel cycle had been ridden on company time and property one time prior to the accident. Rick Childs, a supervisor, stated he had a three-wheel cycle and had ridden it in a field behind the plant. Jones testified he had never seen a three-wheel cycle being ridden on company property or during working hours prior to the accident.

Jones was responsible for turning in his own time and the time of those working for him. For Friday, August 26 Jones talked with Specht after the accident and they agreed that Jones would turn in 12 hours for both of them. This would include time spent at the plant and would exclude time spent going from the plant to the shop site but would resume time on the payroll when they began looking for parts and would continue through to 8:00 or 8:30 p.m. when the accident occurred.

The administrative law judge found the facts set out above but found the weight of the evidence refuted Jones testimony that he was on the payroll at the time of the accident. The finding concluded that at the time of the accident Jones was on a personal pleasure pursuit and the accident was not work connected or a benefit to his employer and thus could not be found to be compensable.

Jones contends that recreational accidents, particularly the operation of the three-wheel motorcycle, had become a condoned practice at Central Missouri and therefore had become incidental to the employment and was within the course of

employment. Central Missouri relies on *Dunnaway v. Stone & Webster Engineering Corp.*, 227 Mo.App. 1211, 61 S.W.2d 398 (1933). Dunnaway was employed on a barge during the construction of Bagnell Dam and during his lunch hour fashioned a hook and line and decided to fish from the barge. While he was fishing Dunnaway fell overboard and drowned. There was evidence that the employer knew that employees fished from barges but had not objected. The court pointed out that the employer had not fostered or encouraged the fishing. The court concluded there was no showing that the accident arose out of and in the course of employment. The court distinguished *Conklin v. Kansas City Public Service Co.*, 226 Mo.App. 309, 41 S.W.2d 608 (1931). In *Conklin* the employee was struck in the eye by a baseball bat while watching an indoor baseball game during the lunch hour on the employer's premises. Conklin was held to be covered by workers' compensation. In *Dunnaway* the court stated *Conklin* was distinguishable because the ballgame was fostered and encouraged by the employer to increase the efficiency of the employees. The employer furnished the room which was for employees only and the activities were with the consent and encouragement of the employer. The court in *Dunnaway* stated this was vastly different from the facts before it which showed only a passive consent by the employer to the fishing. 61 S.W.2d at 400.

Since the decision in *Dunnaway* a rule has evolved which is designed to cover the situation in the instant case. The facts here are distinguishable from the organized sports activity present in *Conklin* and similar cases. This case involves recreational activity undertaken by a few employees on company premises, and according to Jones, during work hours.

■ The rule does not turn on the principles relied upon in *Dunnaway* but is stated in terms of whether or not the activities from which an injury arises has achieved a standing as a custom or practice either in the industry generally or in the place of injury. 1A Larson's Workmen's Compensation Law § 22.12 (1982). Larson states that the activity must achieve standing as a custom or practice to distinguish it from a spontaneous or unprecedented frolic that might be undertaken on the premises. Larson also states that at what point the innovation becomes a fixture of the employment does not depend on a precise formula but that it should exist at least long enough for a reasonable employer to become aware of it. Larson states the test is whether the activity has in fact become an incident of the employment or has persisted long enough so that the employer's ignorance of its existence does not destroy the fact of its existence.

In short Larson suggests that a recreational activity undertaken by employees may become such a custom or practice that the activity in fact becomes an incident of the employment. If it can be said that the activity becomes an incident of the employment, it follows that an injury resulting from the activity can be said to arise out of and in the course of such employment.

Analysis of the recreational activity involved here is based on the analogy to the rules related to personal comfort and horseplay. 1A Larson's Workmen's Compensation Law § 22.12 p. 5–78 n. 20 (1982). In that situation the courts recognize that in order for the activity to arise out of and in the course of employment, the employees conduct or activity must have been approved by long continuing custom and practice. *Ognibene v. Rochester Mfg. Co.*, 298 N.Y. 85, 80 N.E.2d 749, 750 (1948). The court in *Ognibene* stated "it is continuity of practice—conduct which has gained acceptance—that transforms an extra-employment caper into an incident of employment." *Id.* at 750.

■ Jones' claim must fail under the above rule because there is no evidence that the riding of the three-wheel motorcycle was of such custom or practice that it had gained acceptance and had continued long enough for the employer to be held to have knowledge of the activity. The evidence showed that while the three-wheel motorcycle had been ridden before, the

only definite number of times was once prior to the accident. Nor can the evidence of other activities such as target shooting, hunting and fishing aid Jones. The activity out of which the injury arose is the activity which must gain acceptance, either actual or implied, from the employer. 34 Cornell Law Quarterly 676, 679 (1949). This is necessary because the employer may be willing to allow one activity to gain even implied acceptance but may consider another activity unacceptable. Here the evidence showed employees slept while they were waiting, yet it cannot be said that if sleeping gained acceptance riding a three-wheel motorcycle thereby also gained acceptance. Thus, Jones is not entitled to compensation because the evidence does not show that riding a three-wheel motorcycle on company time and property had gained either actual or implied acceptance from the employer. Whether or not some other activity had or had not gained acceptance was immaterial.

The denial of compensation is affirmed.

All concur.